# EXHIBIT 2

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street - 5th Floor
P.O. Box 45029-5029
Newark, New Jersey 07101
Attorney for Plaintiffs

By:    Chanel Van Dyke (165022015)
       Deputy Attorney General
       (973) 648-7819

|  |  |
|---|---|
|  | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION, HUDSON COUNTY<br>DOCKET NO. _____ |
| GURBIR S. GREWAL, Attorney General of the State of New Jersey, and PAUL R. RODRÍGUEZ, Acting Director of the New Jersey Division of Consumer Affairs,<br><br>                                        Plaintiffs,<br><br>                        v.<br><br>YELLOWSTONE CAPITAL LLC; FUNDRY.US LLC; HIGH SPEED CAPITAL LLC; WORLD GLOBAL CAPITAL LLC d/b/a YES FUNDING; HFH MERCHANT SERVICES LLC; MCA RECOVERY LLC; GREEN CAPITAL FUNDING LLC; MAX RECOVERY GROUP LLC; and JANE and JOHN DOES 1-10, individually and as owners, officers, directors, shareholders, founders, managers, members, agents, servants, employees, representatives and/or independent contractors of YELLOWSTONE CAPITAL LLC, FUNDRY.US LLC, HIGH SPEED CAPITAL LLC, WORLD GLOBAL CAPITAL LLC d/b/a YES FUNDING, HFH MERCHANT SERVICES LLC, MCA RECOVERY LLC, GREEN CAPITAL FUNDING LLC, and MAX RECOVERY GROUP LLC; and XYZ CORPORATIONS 1-10,<br><br>                                        Defendants. | Civil Action<br><br><br><br><br>**<u>COMPLAINT</u>** |

Plaintiffs Gurbir S. Grewal, Attorney General of the State of New Jersey ("Attorney General"), with offices located at 124 Halsey Street, Fifth Floor, Newark, New Jersey, and Paul R. Rodríguez, Acting Director of the New Jersey Division of Consumer Affairs ("Director") (collectively, "Plaintiffs"), with offices located at 124 Halsey Street, Seventh Floor, Newark, New Jersey, by way of Complaint, state:

## PRELIMINARY STATEMENT

1.     The Attorney General and the Director commence this action against New Jersey-based Yellowstone Capital LLC ("Yellowstone"); Yellowstone's parent Fundry.US LLC ("Fundry"); Yellowstone's subsidiaries High Speed Capital LLC ("High Speed"), World Global Capital LLC d/b/a YES Funding ("World Global"), HFH Merchant Services LLC ("HFH"), Green Capital Funding LLC ("Green Capital"), and MCA Recovery LLC ("MCA Recovery"); and Yellowstone's affiliate Max Recovery Group LLC ("Max Recovery").[1] Defendants, acting in concert with each other as well as other third-party entities and individuals, have engaged in unconscionable business practices, deceived consumers, and/or made false or misleading statements in the (i) sale of unlawful, predatory and usurious loans to small businesses and their owners, which Defendants masked as merchant cash advances ("MCAs"); (ii) marketing and advertising of the purported MCAs; and (iii) servicing and collection of the purported MCAs.

2.     The Yellowstone MCA Defendants have advertised, marketed, offered, and sold short-term, high-cost financing to small businesses and their owners who need quick access to funds but who may not qualify for traditional financing such as bank loans. Under their "Merchant

---

[1] Yellowstone, Fundry, High Speed, World Global, HFH, and Green Capital are, collectively, the "Yellowstone MCA Defendants." MCA Recovery and Max Recovery are, collectively, the "MCA Collection Defendants." The "Defendants" include all named and unnamed entity and individual defendants.

Agreement" contracts with small businesses and their owners ("Consumers"), the Yellowstone MCA Defendants have purported to provide an MCA—a lump sum payment to purchase a portion of a business's future receivables at a discount—to be repaid by the Consumer as set forth in the contract. Yellowstone has induced these Consumers—often struggling, unsophisticated small businesses whose owners have "bad credit" or need "fast cash"—to enter the Merchant Agreements with false and misleading advertising promising MCAs with flexible repayment terms that are tied to the business's receivables and that do not require the owner's personal guarantee.

3. In reality, the Yellowstone MCA Defendants' Merchant Agreements have subjected Consumers to far less favorable repayment terms than the Consumers would have enjoyed under a legitimate MCA contract, and Defendants have doubled down on their abuse of Consumers through numerous unconscionable, deceptive, and fraudulent servicing and collection practices. Among other things, the Yellowstone MCA Defendants drafted their Merchant Agreements to bury myriad unconscionable terms that, among other things, eliminate the distinctions between loans (with fixed regular payments over a defined term) and legitimate MCAs (with variable payments tied to actual receivables and an undefined term) that Yellowstone touts in its advertising. Under these Merchant Agreements, unlike legitimate MCA contracts, the fixed daily payments extracted from Consumers' accounts have little to no relation to the businesses' receivables, and Consumers whose businesses are struggling have been either stymied in their efforts to adjust their daily payment amounts or driven by Defendants into an even worse financial situation. Meanwhile, the Yellowstone MCA Defendants have, through various other devices, shifted risk onto Consumers—both businesses and their owners—in ways that are inconsistent with legitimate MCA contracts and that have facilitated Defendants' unconscionable collection practices. In short, by masking their MCAs as purchases of accounts receivables, as opposed to

3

what they really are—unlawful and usurious loans—Defendants have sought to avoid responsibility for their predatory lending.

4.      Defendants' misconduct has led to the financial ruin of small businesses and owners across the United States.  As of 2017, Yellowstone had reported advancing $553 million to small businesses.  From 2012 to 2018, MCA companies collected more than $1.5 billion in judgments through the filing of over 25,000 Confessions of Judgment ("COJs").  Yellowstone was responsible for 25% of those filings, making it the biggest filer by far in the MCA industry—an industry that stands to grow substantially as a result of the COVID-19 pandemic, which has caused large numbers of small businesses to struggle and close.

5.      For the reasons stated herein, Plaintiffs bring this action to seek redress for Defendants' violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -226 ("CFA"), and the Regulations Governing General Advertising, N.J.A.C. 13:45A-9.1 to -9.8 ("Advertising Regulations").  Plaintiffs therefore seek to permanently enjoin Defendants' unconscionable and deceptive business practices, and to recover statutory civil penalties, consumer restitution, and other equitable and monetary relief.

## PARTIES AND JURISDICTION

6.      The Attorney General is charged with the responsibility of enforcing the CFA and the Advertising Regulations.  The Director is charged with the responsibility of administering the CFA and the Advertising Regulations on behalf of the Attorney General.  Plaintiffs bring this action pursuant to their authority under the CFA, specifically N.J.S.A. 56:8-8, 56:8-11, 56:8-13, and 56:8-19.

7.      Venue is proper in Hudson County, pursuant to R. 4:3-2, because it is a county in which Defendants have done business.

8.     Defendant Yellowstone is the primary business platform from which Defendants operate.  Yellowstone is a limited liability company established in New York and registered to do business in New Jersey on July 16, 2015.  Yellowstone presently maintains a principal place of business located at 1 Evertrust Plaza, 14th Floor, Jersey City, New Jersey 07302.

9.     Yellowstone's registered agent in New Jersey is Yitzhak Stern, who maintains a mailing address at 1 Evertrust Plaza, Suite 1401, Jersey City, New Jersey 07302.

10.    Defendant Fundry is Yellowstone's parent corporation. Fundry is a limited liability company established in New Jersey on May 26, 2016, with a principal place of business at 1 Evertrust Plaza, Suite 1401, Jersey City, New Jersey 07302.

11.    Fundry's registered agent in New Jersey is Fundry.US, which maintains a mailing address at 1 Evertrust Plaza, 14th Floor, Attention B. Klein, Jersey City, New Jersey 07302.

12.    Defendant High Speed is Yellowstone's wholly owned subsidiary.  High Speed is a limited liability company established in New York on May 5, 2014.  Upon information and belief, High Speed presently maintains a principal place of business and mailing address at 1 Evertrust Plaza, 14th Floor, Jersey City, New Jersey 07302.  High Speed failed to register in New Jersey pursuant to N.J.S.A. 14A:13-3(1), despite doing business in New Jersey and, upon information and belief, maintaining a principal place of business in New Jersey.

13.    High Speed's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

14.    Defendant World Global is Yellowstone's wholly owned subsidiary.  World Global is a limited liability company established in New York on June 27, 2016.  Upon information and belief, World Global presently maintains a principal place of business located at 1 Evertrust Plaza, 14th Floor, Jersey City, New Jersey 07302.  World Global failed to register in New Jersey pursuant

to N.J.S.A. 14A:13-3(1), despite doing business in New Jersey and, upon information and belief, maintaining a principal place of business in New Jersey.

15.     World Global's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

16.     Defendant HFH is Yellowstone's wholly owned subsidiary.  HFH is a limited liability company established in New York on January 9, 2017.  Upon information and belief, HFH presently maintains a principal place of business and mailing address at 1 Evertrust Plaza, 14th Floor, Jersey City, New Jersey 07302.  HFH failed to register in New Jersey pursuant to N.J.S.A. 14A:13-3(1), despite doing business in New Jersey and, upon information and belief, maintaining a principal place of business in New Jersey.

17.     HFH's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

18.     Defendant Green Capital is Yellowstone's wholly owned subsidiary.  Green Capital is a limited liability company established in New York on April 28, 2015.  Green Capital presently maintains a principal place of business and mailing address at 1 Evertrust Plaza, 14th Floor, Jersey City, New Jersey 07302.  Green Capital has never registered as a business in New Jersey as required pursuant to N.J.S.A. 14A:13-3(1), despite doing business in New Jersey and maintaining a principal place of business in New Jersey.

19.     Green Capital's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

20.     Defendant MCA Recovery is Yellowstone's wholly owned subsidiary.  MCA Recovery is a limited liability company established in New York on November 30, 2012.  Upon

information and belief, MCA Recovery presently maintains a principal place of business and mailing address at 17 State Street, Suite 4000, New York, New York 10004.

21.     MCA Recovery's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

22.     Defendant Max Recovery is a debt collection company affiliated with Yellowstone. Max Recovery is a limited liability company established in New York on January 18, 2017.  Upon information and belief, Max Recovery presently maintains a principal place of business and mailing address at 55 Broadway, 3rd Floor, New York, New York 10006.

23.     Max Recovery's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

24.     At various times, Defendant Yellowstone employed, contracted with, and/or acted through and in concert with a web of third parties, including entities and/or individuals described by Yellowstone as Independent Funding Organizations ("Funders"), Independent Sales Organizations ("ISOs"), and Sales Representatives (collectively, "Third Parties"), in its MCA transactions with Consumers.

25.     Upon information and belief, Jane and John Does 1 through 10 are fictitious individuals meant to represent the owners, officers, directors, shareholders, founders, managers, members, agents, servants, employees, representatives, and/or independent contractors of Yellowstone, Fundry, High Speed, World Global, HFH, MCA Recovery, Green Capital, and/or Max Recovery, who have been involved in the conduct that gives rise to this Complaint, but are heretofore unknown to the Plaintiffs.  As these defendants are identified, Plaintiffs shall amend this Complaint to include them.

26.     Upon information and belief, XYZ Corporations 1 through 10 are fictitious entities

meant to represent any additional entities that have been involved in the conduct that gives rise to this complaint, but are heretofore unknown to the Plaintiffs.  As these defendants are identified, Plaintiffs shall amend this Complaint to include them.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

27.     Since at least July 2015, the Yellowstone MCA Defendants—Yellowstone, Yellowstone's parent Fundry, and Yellowstone's subsidiaries High Speed, World Global, HFH, and Green Capital—in concert with each other and related or affiliated entities and the Third Parties, have advertised, marketed, offered for sale, and sold MCAs to Consumers in this State and elsewhere, and have serviced the repayment of the MCAs by such Consumers.  The MCA Collection Defendants—MCA Recovery and Max Recovery—in concert with the Yellowstone MCA Defendants and/or other related or affiliated Third Parties, have engaged in debt collection from Consumers on behalf of the Yellowstone MCA Defendants.

28.     The Yellowstone MCA Defendants purport to provide Consumers an MCA—a lump sum payment to purchase a portion of a business's future receivables at a discount—to be repaid by the Consumers as set forth in the Yellowstone MCA Defendants' Merchant Agreements.

29.     As set forth herein, however, the Yellowstone MCA Defendants' Merchant Agreements contain numerous unconscionable terms that, among other things, cause them to operate as unlawful, usurious loans rather than legitimate MCAs.  The Yellowstone MCA Defendants, and Yellowstone in particular, relied on false and misleading advertising and misrepresentations to induce Consumers to enter their unlawful, one-sided Merchant Agreements. And, once they induced Consumers to enter the Merchant Agreements, Defendants engaged in myriad unconscionable, deceptive, and fraudulent practices in connection with servicing the repayment of the MCAs and collection of debts they alleged to be owed on those MCAs.

A.      <u>**Background on MCAs**</u>

30.     In a typical merchant agreement involving the purchase and sale of receivables, a small business agrees to sell a percentage of its future receivables in exchange for a lump sum payment—an MCA.  The business agrees to a repayment amount exceeding the amount of the MCA, and that amount is repaid through daily payments reflecting a percentage of the business's estimated average daily receivables (with that percentage being equal to the percentage of the business's receivables purchased by the MCA company).

31.     Estimated daily payments typically are calculated based on a review of several months of receivables. That information is used to determine the business's average monthly receivables, which are then divided by the average number of business days in a month to determine the average daily receivables. The average daily receivables are then multiplied by the percentage of receivables purchased by the MCA company to calculate the estimated daily payments.

32.     Unlike a loan, a legitimate MCA contract does not guarantee the issuer regular payments or payment over a fixed, finite term. Instead, if a business's receivables change over time, its daily payment amount can be adjusted through a process called "reconciliation." A decrease in receivables decreases the merchant's daily payments, and the MCA will be repaid over a longer period. In addition, the MCA company's recourse in the event of default typically lies with the small business's receivables.

33.     The variability and lack of security associated with legitimate MCA contracts create certain risks for the MCA company – and corresponding protections for the merchant – in the event of a downturn in the merchant's business. In part because legitimate MCAs, unlike traditional closed-end installment loans, do not involve fixed regular payments and a finite repayment period,

MCAs generally are excluded from certain consumer protections that apply to loans, such as usury caps.

**B.** **The Yellowstone MCA Defendants' Merchant Agreements Include Numerous Unconscionable Terms and Conditions and Are Implemented in an Unconscionable Manner**

34.     Although the Yellowstone MCA Defendants' Merchant Agreements were presented to Consumers as MCA contracts, the Merchant Agreements include numerous terms and conditions that made them substantially less favorable to Consumers than typical MCA contracts, that were individually and collectively unconscionable, and that were implemented by Defendants in an unconscionable manner.

**1.     Yellowstone Advertised the Merchant Agreements As Having the Benefits of Typical MCA Contracts**

35.     Notwithstanding the disadvantageous terms and conditions that distinguished the Yellowstone MCA Defendants' Merchant Agreements from typical MCA contracts, Yellowstone specifically touted the substantial distinctions between traditional loans and MCAs in its marketing to small business owners in need of "fast cash" or with bad credit.

36.     Yellowstone's advertising described its MCA repayment terms as flexible, "not fixed," and "calculated as a set percentage of your sales":

> One of the biggest advantages to taking out a cash advance is the fact that repayments are not fixed.  You won't pay X amount until the debt is settled, instead you'll pay a different amount each month, which is calculated as a set percentage of your sales.  This means that your business will never be crippled with high repayment fees – because they'll always be in proportion with your actual sales.

37.     Similarly, in another advertisement, Yellowstone described its flexible repayment terms as "based directly on sales":

> When it comes to repaying your cash advance we know that fixed monthly payments can be very challenging for businesses to accommodate – especially if your business is in a seasonal market.

> For that reason the repayments that you make will be based directly on the sales that you make that month. So if sales are up[,] you'll pay a larger repayment, but if sales are down, you'll pay less. Repayments are calculated by a percentage of your sales – which offers great flexibility.

38.     In addition, Yellowstone promoted its MCAs as not requiring a personal guarantee:

    a.     "Here at Yellowstone Capital we provide no personal guarantee capital for most businesses"; and

    b.     "We Provide Capital With No Personal Guarantee."

39.     Yellowstone also advertised its MCAs as "unsecured" in YouTube promotional videos.

## 2.     Consumers' Daily Payments Were Fixed, Instead of Calculated As a Percentage of Receivables As Advertised

40.     Despite specifically citing these distinctions between traditional loans and MCAs as a selling point, the Yellowstone MCA Defendants structured their Merchant Agreements to eliminate these distinctions altogether, and to include unconscionable terms that shift risk to the Consumers. The Merchant Agreements in fact obligate Consumers to pay a fixed amount subject to interest, over a defined period, untethered from the Consumers' receivables – just as the Consumers would be obligated to repay a traditional loan, but without the legal protections afforded to loan borrowers.

41.     In addition, as part of the Merchant Agreement, the Yellowstone MCA Defendants compelled Consumers to execute additional documents including unconscionable terms and conditions that not only obligated the small business owners to personally guarantee repayment of these usurious loans, but also made it exceedingly simple for Defendants to obtain a one-sided judgment against and/or to freeze and seize the assets of not only the small business, but the small business owner.

11

42.     The Merchant Agreement consists of the front page and Terms and Conditions Sheet; Addendum to Secured Merchant Agreement; Appendix A – Fee Structure; ACH Authorization Form; a Security Agreement and Guaranty; and/or an Affidavit of Confession of Judgment. At various times, the Yellowstone MCA Defendants printed the Merchant Agreements in small, illegible type, with material provisions appearing in 5.5-point to 6-point font size.

43.     The first page of the Merchant Agreement[2] states:

### **PURCHASE AND SALE OF FUTURE RECEIVABLES**

> Merchant hereby sells, assigns and transfers to [Yellowstone] (making [Yellowstone] the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers' . . . (the "Receipts" . . . ), for the payment of Merchant's sale of goods or services until the amount specified below (the "Purchased Amount") has been delivered by Merchant to [Yellowstone].

> The Purchased Amount shall be paid to [Yellowstone] by Merchant's irrevocably authorizing <u>only one</u> depositing account acceptable to [Yellowstone] (the "Account") to remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each transaction, until such time as [Yellowstone] receives payment in full of the Purchased Amount. . . . [Yellowstone] may, upon Merchant's request, adjust the amount of any payment due under this Agreement at [Yellowstone]'s sole discretion and as it deems appropriate . . . .

44.     Immediately below this text in large letters are listed the Purchase Price, the Specified Percentage (usually between 10% and 25%), and the Purchased Amount. For example, one Consumer's Merchant Agreement stated:

**Purchase   Price:  $   20,000.00   Specified   Percentage:   20   %
Receipts Purchased Amount: $28,600.00**

---

[2] There are minor, immaterial differences among the Merchant Agreements, Addendum, and other documents used by the multiple Yellowstone MCA Defendants with different Consumers.

Thus, in exchange for a $20,000 lump sum (less certain inadequately disclosed fees) that Yellowstone would pay to the Consumer, Yellowstone would be owed $28,600 from the Consumer's future receivables to be paid in daily payments of 20% of receivables. Specifically, the Merchant Agreement provides that the Consumer is required to pay the Specified Percentage (in this case 20%) "of the Merchant's settlement amounts due from each transaction" and that Yellowstone would debit that "specified remittance from the merchant's bank account on a daily basis."

45.     Although this language in the Merchant Agreement provides that the Daily Payment should be calculated as the Specified Percentage of expected receivables – as in a legitimate MCA contract – the language is modified by the "Addendum to the Secured Merchant Agreement" ("Addendum").  The Addendum, which is executed simultaneously with the Merchant Agreement and controls in the event of a conflict with the Merchant Agreement, automatically converts the Specified Percentage to a fixed Daily Payment:

> By signing below, the Merchant hereby requests and acknowledges that the Specified Percentage **shall be revised** to [AMOUNT] per business [d]ay (the "Daily Payment") **which the parties agree is a good-faith approximation of the Specified Percentage, based on the Merchant's prior receipts due to [Yellowstone] pursuant [to] the Agreement**.

> [Emphasis added.]

46.     The Daily Payment is set so that the full Purchased Amount is absolutely payable in a fixed period, often as short as 100 days.  For the exemplar Consumer noted above, the revised Daily Payment was $358, and the repayment term was just 80 business days or 102 calendar days, resulting in an annual interest rate that exceeds the interest rates codified in New Jersey's usury laws.

**3.      Consumers' Daily Payment Obligations Were Not Tethered to Estimated or Actual Receivables**

47.      Despite the Addendum stating that "the parties agree" that the Daily Payment "is a good-faith approximation of the Specified Percentage, based on the [Consumer]'s prior receipts due to [the Yellowstone MCA Defendants] pursuant [to] the Agreement," on information and belief, the Yellowstone MCA Defendants did not review Consumers' receipts to determine the Daily Payment amount.

48.      At various times, contrary to representations in the Merchant Agreement, Yellowstone's advertising, and the Addendum itself, the fixed Daily Payment bore no meaningful relationship to the Specified Percentage of Consumers' actual estimated receivables.

49.      Unlike the typical review of accounts receivable performed by the purchaser prior to entering an agreement to purchase future receivables, the Yellowstone MCA Defendants only review, at most, the merchant's prior bank statements.

50.      To obtain financing from the Yellowstone MCA Defendants, Consumers are only required to submit their "last three months of business banking statements and a completed application."  The Merchant Agreements do not require Consumers to identify their customers or to provide the Yellowstone MCA Defendants with copies of the merchant's invoices.

**4.      Consumers Were Unable to Modify Daily Payments Through Reconciliation**

51.      The Yellowstone MCA Defendants do not modify the Daily Payments or provide a right to modify the Daily Payments to account for changes in Consumers' receivables as stated in Yellowstone's advertising and as is typical in legitimate MCA contracts.

52.      The Merchant Agreement provides that Consumers may request a reconciliation to adjust the fixed Daily Payment to account for changes in the Consumers' receivables, but the terms of the Merchant Agreement and Addendum make this option illusory. First, the Merchant

Agreement provides that modification of the Consumer's fixed Daily Payment rests in the MCA Defendant's "sole discretion and as it deems appropriate." Similarly, the Addendum provides that reconciliation is "only a courtesy" that the Yellowstone MCA Defendants are "under no obligation to provide[.]"

53.     Even worse, provisions buried in small print in the Addendum impose severe restrictions on the availability of reconciliation and on Consumers' ability to even request it. The Addendum provides that the Consumer may request reconciliation only within five (5) days following the end of the month (and in some contracts, only within three (3) days) and within that same limited window the Consumer also must provide all "evidence and documentation" demanded by the Yellowstone MCA Defendant in its "sole and absolute discretion."

54.     Prior to November 2018, Defendant Yellowstone provided inadequate notice to Consumers of their ability to request reconciliation under the Merchant Agreements by burying the relevant provisions in the Addendum at the end.  It was only after facing public criticism in November 2018 that Yellowstone began to provide a separate notice to Consumers at the time of funding to ensure that they were aware of their ability to request reconciliation under the Merchant Agreements.

55.     When Consumers did attempt to notify Defendant Yellowstone of financial difficulties and request reconciliation, after executing the Merchant Agreements, they often could no longer reach Yellowstone.

56.     At various times, Defendants have refused to adjust the Daily Payment amount, despite Consumers' lack of incoming receivables.

57.     The following Consumer experiences illustrate the challenges Consumers faced when seeking reconciliation:

a.  Before defaulting and being forced into an unfavorable settlement agreement with Defendant Yellowstone, a Pennsylvania Consumer had emailed Yellowstone twice "asking for relief and to slow down my payback." Yellowstone replied that the Consumer "was a new customer and that [the Consumer] was not far enough in to [her] loan, when in fact [she] was more than 60% through [her] second loan with Yellowstone."

b.  One Consumer sent an email to Defendant MCA Recovery providing in pertinent part: "this week will be a severe cash flow crunch for me – leading up to Memorial Day weekend sales have been slower than usual. Can you please postpone pulls for a week until after the holiday?"  MCA Recovery responded by asking if the Consumer had another account that it could debit from. In response to subsequent emails from the Consumer explaining that "I'm 62 with a young disabled son, I'm about to lose our home, and file for bankruptcy" and again requesting a revised repayment plan, MCA Recovery forwarded that email to Defendant Yellowstone with the message: "CONTROL YOUR GIRL. Craziest fucking merchant ever."

c.  When a New York Consumer contacted Defendant Yellowstone to advise that his account was overdrawn and to request a "temporary daily payment decrease from $750 to $100 for 3 weeks," Yellowstone "stated they needed several documents of which all were sent. Then they needed one more document[,] [but] when it was sent[,] they stated since I had taken out a loan after theirs[,] they could not work with me even though I informed them that my account was overdrawn and if I didn't get the issue resolved I would not have the ability to keep my bank account opened. They were not concerned and still refused to negotiate." In responding to the Consumer, Yellowstone noted that he "accepted funds based on set terms that he ultimately could not meet" and that the Consumer "had taken the full funding amount based on a contractually predetermined agreement in terms of payback schedule."

58.    By converting the Specified Percentage to a fixed Daily Payment of specified duration untethered from Consumers' receivables and/or making reconciliation to account for changes in Consumers' receivables largely unavailable, the Yellowstone MCA Defendants eliminated much of the variability with legitimate sales of receivables and effectively converted them to fixed-rate, finite-term loans.

**5.      Other Hidden and Unconscionable Contract Terms Empowered the Yellowstone MCA Defendants at Consumers' Expense and Put Consumers' Assets at Risk**

59.      Additional documents that must be signed as a condition of entering the Merchant Agreement contained other onerous provisions that shifted risk from the Yellowstone MCA Defendants to the Consumers.

60.      As discussed further below, Consumers were required to execute a Security Agreement, Guaranty, and an Affidavit of COJ as part of the Merchant Agreement.

61.      The Merchant Agreement required the Consumer to enter into an irrevocable Power of Attorney appointing a Yellowstone MCA Defendant,

> as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to [the Yellowstone MCA Defendants] . . . in the case of . . . the occurrence of an Event of Default . . . from Consumer, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign [Consumer]'s name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to [the MCA Defendant]; and (v) to file any claims or take any action or institute any proceeding which [the MCA Defendant] may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount[.]

62.      The Merchant Agreement prohibited Consumers from interrupting, transferring, moving, selling, disposing, or otherwise conveying their businesses or assets without "the express prior written consent of [the Yellowstone MCA Defendants]."

63.      The Merchant Agreement's ACH Authorization Form required Consumers to provide the Yellowstone MCA Defendants with all information necessary to access the Consumers' bank accounts, including their bank name, bank portal website, username, password,

security question/answer 1, security question/answer 2, and security question/answer 3.

64.     Acceleration clauses within the Merchant Agreement provided that upon any of the specified events of default, "[t]he full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately"; Defendants may immediately and without notice to the Consumer enter and execute on the COJ "in the amount of the Purchase Amount stated in the Agreement, plus attorneys' fees calculated at twenty-five percent (25%) of the balance due hereunder at the time of breach"; and Defendants may immediately and without notice to the Consumer initiate a lawsuit, and in the event a judgment is recovered, the Consumer "shall be liable for all of [Defendants'] costs of lawsuit, including but not limited to all reasonable attorneys' fees and court costs" in addition to attorneys' fees calculated at twenty-five percent (25%) of the balance due at the time of the breach.

65.     At various times, the Merchant Agreement provided that the inability of the Consumer to pay its debts, general assignment for the benefit of creditors, interruption, suspension, dissolution or termination of its business, and a voluntary or involuntary bankruptcy filing are events of default triggering the acceleration clause and the one-sided protections afforded the Yellowstone MCA Defendants by the Security Agreement, Guaranty, and COJ.

66.     Appendix A to the Merchant Agreement (which provides a list of fees) provided that a fee will be assessed upon an event of default.  Buried within that provision, Appendix A provided at various times that just two (or four depending on the Merchant Agreement) missed Daily Payments constituted a default, thereby triggering the acceleration clause and enforcement mechanisms available to the Yellowstone MCA Defendants through the Security Agreement, Guaranty, and COJ.

67.     The Merchant Agreement also provided at various times that Consumers "consent[]

to the waiver of notice prior to [the Yellowstone MCA Defendants] exercising any and all rights provided for in this Agreement[.]"

68.     Further, the Merchant Agreement required Consumers to acknowledge that the Yellowstone MCA Defendants "may be using 'doing business as' or 'd/b/a' names in connection with various matters relating to the transaction between [the Yellowstone MCA Defendants] and [Consumer]," including notices or filings, and the Security Agreement equally permitted the Yellowstone MCA Defendants to "use another legal name and/or D/B/A" in notices or filings.

69.     In the event of default, the Security Agreement enabled Defendants to collect all amounts due under the Merchant Agreement by reaching beyond the small business's receivables to the Consumer's assets "now owned, or hereafter acquired, including without limitation: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the 'UCC'), now or hereafter owned or acquired by [Consumer]; and (b) all proceeds, as that term is defined by Article 9 of the UCC."

70.     Through the Security Agreement, the MCA Defendants obtain a security interest in the Consumer's assets.  To perfect that security interest, Defendants must issue a UCC-1 Financing Statement.  A UCC-1 Financing Statement provides notice to all interested parties of Defendants' right to seize the Consumer's assets and serves as a lien on secured collateral.  Upon the occurrence of an alleged event of default under the Merchant Agreement, the MCA Defendants may seek to perfect the UCC-1 Financing Statement by filing it with the Secretary of State in the small business's state of incorporation.

71.     The broad Guaranty provided recourse beyond the assets of the small business to its owner's personal assets.

72.     At various times, the Yellowstone MCA Defendants could invoke this personal guarantee "at the time [Consumer] admits its inability to pay its debts, or makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against [Consumer] seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts."

**6.     Consumers Were Required to Sign an Unconscionable Affidavit of COJ and Waive Their Rights**

73.     Defendants told Consumers that the only way to obtain an MCA was to execute an Affidavit of COJ.

74.     The Affidavit of COJ permitted the MCA Collection Defendants to obtain a judgment against the small business and its individual owner in the event of a future default.  By signing the Affidavit of COJ in advance of any purported default, the Consumer waived his or her rights and consented to the entry of judgment for the entire balance owed under the Merchant Agreement.

75.     The Yellowstone MCA Defendants failed to inform Consumers prior to signing the COJ that they required the small business owners to sign both in their individual capacity and on behalf of their business, thereby allowing a judgment against both the Consumer's business assets and personal assets in the event of a purported default.

76.     Defendants' one-sided Affidavit of COJ also provided for judgment against the Consumer for liquidated attorneys' fees in the amount of 25% of the outstanding balance, costs, expenses, disbursements, and "interest at the rate of 16% per annum from [the date of the Merchant Agreement], or the highest amount allowed by law, whichever is greater."   The attorneys' fees

provisions provide for excessive fees compared to the minimal work required to file the COJs and related documents.

77.     Upon an alleged default, the MCA Collection Defendants—on behalf of the Yellowstone MCA Defendants—would file the Affidavit of COJ, along with their own Affidavit of Non-Payment, and a proposed form of judgment with the County Clerk without notice to the Consumer.  The County Clerk then filed the judgment without notice to the Consumer, and without a hearing, or any review by a judge.

78.     At various times, Defendants engaged in robo-signing, or filing the same generic Affidavit of Non-Payment form in support of COJs, wherein they accuse Consumers of stopping Daily Payments, when in fact those Consumers were still current in their Daily Payments.

79.     Defendants also facilitated their filing of COJs by designating 10 New York counties in the COJ as permissible filing locations, despite New York law requiring that COJs only designate one county where the affidavits may be filed.

80.     In addition, as a condition of the Merchant Agreement, Defendants required Consumers to waive any claims against the Yellowstone MCA Defendants "under any legal theory" and also to waive the right to a jury trial or to bring a class action.

81.     Defendants also required Consumers, in advance, to "waive any and all objections to jurisdiction or venue" and to "waive any right to oppose any motion or application made by either party to transfer such proceeding to an Acceptable Forum[.]"

82.     After entry of the judgment by the County Clerk, the MCA Collection Defendants then sought to collect on the judgment by freezing Consumers' bank accounts, often before the Consumers even became aware a COJ was filed against them.

83.     Indeed, at various times, as a result of Defendants' actions, Consumers only became

aware of a judgment when they could not make payroll or pay critical operating expenses after their bank accounts were frozen. Adding to the confusion and unfairness, the Consumers often do not recognize the names of the entities attempting to collect on the judgments.

84.     Many states have banned COJs as against public policy, and in August 2019, New York amended its COJ statute to prevent Defendants, among other MCA companies, from enforcing COJs against Consumers located outside of New York.

## C.     The Yellowstone MCA Defendants' Merchant Agreements Operate as Usurious Loans

85.     Although the Yellowstone MCA Defendants characterize the MCAs as "purchase[s] and sale[s] of future receivables," which are not subject to certain borrower protections such as usury laws, and state that the Purchase Price "is not intended to be, nor shall it be construed as a loan," the terms of the Merchant Agreements make the MCAs operate as loans.

86.     Unlike legitimate purchases and sales of receivables, loans provide a greater degree of certainty to creditors through their fixed, regular payments and finite repayment terms.  In exchange for the rigid payment terms loans impose on borrowers, interest is capped to protect borrowers from usurious rates, and lenders are regulated by certain additional state and federal laws.

87.     The stream of payments back to the Yellowstone MCA Defendants is not variable in either amount or number of payments to be made.

88.     Specifically, the fixed Daily Payment amounts are not meaningfully tied to receivables, do not vary from day to day, have a finite repayment term for the full Purchased Amount, and the ability to adjust those payments based on receivables is virtually non-existent.

89.     And, as noted, the Merchant Agreements provide the Yellowstone MCA Defendants with recourse far beyond the Consumer's receivables in the event of default, through security interests, guarantees, and COJs.

90.     The Yellowstone MCA Defendants structured the MCAs to be just as secure as and to operate as traditional fixed-payment, finite-term loans, but without the statutory interest protections afforded to borrowers of those loans.

91.     Yellowstone even advertises its MCAs as loans (e.g., "No Personal Guarantee Loans"; "Need a loan for your business?"; "Bad Credit Business Loans"; "Yellowstone Capital makes it easy to obtain an unsecured bad credit business loan") and characterizes itself as a "direct lender" in certain email solicitations sent to Consumers, although such advertising is inconsistent with other representations made by the Yellowstone MCA Defendants.

92.     For example, Yellowstone used the following advertisement describing the MCAs it offers as a "loan" and "line of credit" to obtain "fast cash":



93.     In or around August 2013, Yellowstone also advertised its MCA program as "bad credit business loans."

94.     New Jersey's civil usury statute, specifically N.J.S.A. 31:1-1, caps interest rates on loans at 6% per annum, or 16% per annum when there is a written contract specifying the rate of

interest.  New Jersey's criminal usury statute, specifically N.J.S.A. 2C:21-19, caps annual interest rates at 30% for non-corporate borrowers, and 50% for corporate borrowers.

95.     The Yellowstone MCA Defendants regularly charge Consumers annual interest rates on their loans that far exceed the maximum rates permitted by New Jersey law. For example:

a.  Defendant Green Capital loaned a Colorado Consumer $125,000 (the "Purchase Price") and required the Consumer to pay back $186,875 (the "Purchased Amount") in daily payments of $1,995 (the "Daily Payment") over the course of approximately 93 business days, or approximately 119 calendar days.[3]  Thus, the annual interest rate charged by Green Capital exceeds the rates permitted by New Jersey usury laws.

b.  A Florida Consumer's Merchant Agreement with Defendant Yellowstone provided for a Purchase Price of $3,000, a Purchased Amount of $4,377, a Daily Payment of $65 per business day, and repayment term of 85 days.  Thus, the annual interest rate charged by Yellowstone exceeds the rates permitted by New Jersey usury laws.

c.  A Maryland Consumer's Merchant Agreement with Defendant World Global provided for a Purchase Price of $285,000, a Purchased Amount of $427,215, a Daily Payment of $4,299 per business day, and repayment term of 127 days. Thus, the annual interest rate charged by World Global exceeds the rates permitted by New Jersey usury laws.

## D.     Defendants Engaged in False and Misleading Advertising

### 1.     Yellowstone Misrepresented That it Provides MCAs Regardless of Credit or Collateral

96.     Until at least April 18, 2019, the "home" page of the Yellowstone Website offered small businesses funding, claiming to "say yes to more small businesses, regardless of collateral or credit":

---

[3] To calculate the repayment term, the Purchased Amount is divided by the Daily Payment (e.g., $186,875 ÷ $1,995 = approximately 93 days, which equates to approximately 13 weeks).  To account for weekends, as the Daily Payment is only withdrawn on business days, add two days for each week (e.g., 13 x 2 = 26 weekend days).  Therefore, the approximate total repayment term is 119 days (e.g., 93+26).

Yellowstone Capital | Home



97.     As noted, the Merchant Agreements in fact require Consumers to simultaneously execute Security Agreements providing "Collateral," and in some instances, "Additional Collateral" and "Cross-Collateral," to secure the payment and performance obligations due to Yellowstone.

98.     In addition, the Merchant Agreements expressly permit "[Yellowstone], [its] agents and representatives and any credit-reporting agency engaged by [Yellowstone], to . . . pull a credit report at any time now or for so long as Merchant and/or Owner(s) continue to have any obligation owed to [Yellowstone] as a consequence of this Agreement or for [Yellowstone's] ability to determine Merchant's eligibility to enter into any future agreement with [Yellowstone]."

99.     Indeed, contrary to the representations on the Yellowstone Website, Yellowstone does investigate Consumer credit, as Yellowstone or its affiliates have made unauthorized and/or

excessive credit inquiries that negatively affected the Consumers' credit scores.

2. **Yellowstone Misrepresented That Its MCAs Are "Unsecured" and/or Do Not Require a Personal Guarantee**

100. Defendant Yellowstone marketed its MCAs as "unsecured" in YouTube promotional videos. However, Yellowstone's Merchant Agreements are often specifically labeled as "secured" in bold, underlined type at the top of the agreement:

# YELLOWSTONE CAPITAL LLC
30 Broad Street, 14th Floor, Suite 1462, New York, New York 10004
One Evertrust Plaza, Suite 1401, Jersey City, New Jersey 07302

## SECURED MERCHANT AGREEMENT

101. Moreover, the Merchant Agreements are secured by: personal guarantees from the small business owners; UCC security interests over the merchants' accounts and other assets; and signed, notarized COJs from the merchants and their guarantors.

102. In another advertisement, Defendant Yellowstone stated that it provides "no personal guarantee loans." But Yellowstone required Consumers to execute a Guaranty and Affidavit of COJ as part of the Merchant Agreement. These documents required the individual business owner to personally guarantee repayment of the MCA and expressly enabled Yellowstone to obtain a judgment against the small business's assets and the owner's personal assets in the event of a purported default.

3. **Yellowstone Misrepresented That it Provides Flexible Repayment Terms**

103. In at least two advertisements, Defendant Yellowstone advertised its flexible repayment terms by representing:

- "if sales are up[,] you'll pay a larger repayment, but if sales are down, you'll pay less";

- "repayments are not fixed"; and

- "your business will never be crippled with high repayment fees – because they'll always be in proportion with your actual sales[.]"

104.    These advertisements were false and deceitful. As noted, Yellowstone's Merchant Agreements, particularly the Addendum, provided for fixed Daily Payments that are not meaningfully tied to Consumers' receivables. The Addendum also imposed severe restrictions on Consumers' ability to request reconciliation due to a reduction in their receivables. In addition, Defendants either failed to respond to Consumer requests to reduce the Daily Payment amount where the Consumer's actual sales did not support them, or simply refused to reduce payments and instead required the MCAs to be paid back within a specified time period.

105.    For example, a Michigan Consumer tried to reach Yellowstone, after one of his clients stopped paying him, to notify Yellowstone that the client's non-payment was impacting his ability to make the Daily Payments, but every time the Consumer called Yellowstone, no one answered. Eventually, Yellowstone filed a COJ and UCC lien against this Consumer.

106.    Another North Carolina Consumer repeatedly called Yellowstone to advise that no money was coming in, but Yellowstone kept demanding the same Daily Payment and never mentioned reconciliation.

**E.    Defendants Engaged in Numerous Other Fraudulent Business Practices**

107.    Compounding the effects of their one-sided Merchant Agreements, Defendants engaged in misrepresentations and unconscionable business practices that harm Consumers in their origination-, servicing-, and collection-related activities. Defendants' fraudulent business practices have included misrepresenting the amounts of financing they will provide and fees they will charge; misrepresenting their office locations and staff identities; making unauthorized withdrawals from Consumers' accounts; unconscionably deploying COJs, Security Agreements,

and UCC filings in their collection activities; fraudulently inducing Consumers to refinance their MCAs; employing threatening and harassing collection tactics; conducting unauthorized and excessive credit checks; and misleading Consumers as to their relationships with various Third Parties.

### 1.   The Yellowstone MCA Defendants Made Material Misrepresentations to Consumers

#### a. Misrepresentations of the Amounts of Financing Provided and Fees Charged

108.   At various times, the Yellowstone MCA Defendants misrepresented to Consumers the amount of the Purchase Price they would receive, the amount of fees the Yellowstone MCA Defendants would debit from their bank accounts, and the upfront fees they charged.

109.   The Yellowstone MCA Defendants failed to conspicuously disclose that various fees buried toward the end of the Merchant Agreements are withdrawn upfront from the promised Purchase Price.  As a result, Consumers enter these Merchant Agreements expecting to receive the full Purchase Price in their bank accounts, only to then receive a significantly lower amount than they were promised.

110.   For example, Defendant Yellowstone underfunded the $3,000 Purchase Price specified in a Florida Consumer's Merchant Agreement by $150, without informing the Consumer that any of the fees disclosed in the Merchant Agreement would reduce the Purchase Price amount to be transferred to the Consumer's bank account.

111.   Similarly, Defendant Green Capital withheld $6,250 in fees from the Purchase Price of $125,000 pursuant to a Colorado Consumer's Merchant Agreement, without disclosing in that Merchant Agreement that certain fees would be deducted upfront from the Purchase Price and the respective amount of each such fee.

112.   On at least one occasion, Defendant Yellowstone failed to accurately disclose the

Origination Fee amount in the Merchant Agreement.

113.   Specifically, for that Michigan Consumer, the Merchant Agreement provided for the Origination Fee to be "$295.00," but then a Fee Sheet provided to the Consumer for the same Merchant Agreement stated that the Origination Fee would be "5%." The latter equated to an Origination Fee of $1,430.00, which is significantly more than the $295.00 Origination Fee specified in the Merchant Agreement.

114.   Alternatively, at various times, the Yellowstone MCA Defendants' Merchant Agreements provided that several of the fees would be either a defined amount or a percentage of the funded amount (e.g., ACH Program Fee of "$395.00 or up to 10% of the funded amount," Bank Fee of "$195.00 or up to 10% of the funded amount"), but then failed to notify Consumers what the specific amount of each of those fees would be and whether those amounts would be withheld from the Purchase Price.

115.   At various times, the Yellowstone MCA Defendants withheld amounts greater than the specified fee amount from the Purchase Price or failed to disclose additional withheld fee(s).

116.   At various times, Defendants Yellowstone and MCA Recovery charged Consumers additional fees not disclosed in the Merchant Agreements.

117.   For example, a Washington Consumer sent an email to Defendant MCA Recovery regarding her Merchant Agreement with Defendant Yellowstone.  The email provided in pertinent part: "I had also asked about the smaller fees that have been applied throughout – there is no explanation of what these are and you did not answer my questions about this either. I was not aware of any additional fees being added on. This was not explained to me. If this is written somewhere, then I need to see where that is written so I can look it up."  Upon information and belief, Defendant MCA Recovery never responded to the Consumer.

118.    Similarly, a Utah Consumer sent an email to Defendant Yellowstone stating in pertinent part: "I am being lied to about additional fees but not being provided a statement of those fees. My repayment contract already included $8857.61 in fees." Upon information and belief, Defendant Yellowstone never responded to the Consumer.

119.    On at least one occasion, the Yellowstone MCA Defendants promised Consumers a specific amount of financing in the Merchant Agreement, but then underfunded the Purchase Price and instead provided Consumers with a smaller amount of financing than promised.

120.    For example, Defendant HFH entered two Merchant Agreements with a Maryland Consumer providing for Purchase Prices of $50,000 and $150,000, but then underfunded the Purchase Prices by $5,366 and $12,862, respectively.

121.    Subsequently, Defendants World Global and High Speed entered two more Merchant Agreements with that same Consumer providing for Purchase Prices of $285,000 and $425,000, but then underfunded the Purchase Prices by $24,096 and $21,744, respectively.

122.    Collectively, the Consumer received $64,068 less than the amounts promised in the four Merchant Agreements she entered with Defendants HFH, World Global, and High Speed.

**b.  Misrepresentations of Office Location and Staff Identities**

123.    At various times, Defendants Yellowstone and MCA Recovery misrepresented to Consumers that they maintained an office in New York.

124.    When at least two Consumers flew from Michigan and Texas, respectively, to Defendants' purported offices in New York after Defendants repeatedly failed to respond to the Consumers' attempts to contact them, the Consumers found no office at the location provided by Yellowstone and MCA Recovery.

125.    At various times, Defendants held individuals or entities out as employees to Consumers by permitting those individuals or entities to work out of desktops on Yellowstone

premises, or to send emails to Consumers from Yellowstone email addresses, but then later claimed those individuals or entities were "Third Parties" for which Defendants were not responsible.

### 2.  The Yellowstone MCA Defendants Made Unauthorized Withdrawals From Consumers' Accounts

126.  At various times, the Yellowstone MCA Defendants made unauthorized withdrawals from Consumers' accounts.  Because Consumers were not expecting the Yellowstone MCA Defendants' unauthorized debits, these withdrawals often caused additional financial harm to Consumers such as overdraft fees and lost operating capital.

127.  The Yellowstone MCA Defendants continued withdrawing purported Daily Payments from Consumers' bank accounts after the Consumers had fully repaid the "Purchased Amount."  After unlawfully withdrawing additional amounts sometimes totaling thousands of dollars from individual Consumers, the Yellowstone MCA Defendants failed to timely refund the Consumers either in whole or in part and/or to respond at all to Consumers' inquiries regarding the unauthorized withdrawals.

128.  Examples of Consumers from whose accounts the Yellowstone MCA Defendants made unauthorized withdrawals include:

    a.  An Illinois Consumer who complained that Defendant Yellowstone had withdrawn excess payments amounting to more than $5,000 and that he was unable to contact anyone at Yellowstone to address the issue.

    b.  A Rhode Island Consumer who reported that after she had repaid the Purchased Amount in full, Defendant Yellowstone continued to debit the Daily Payment amount from her account until she was forced to request that her bank issue a stop payment order.

    c.  Defendant Yellowstone withdrew an additional $7,100 from a New York Consumer's account without his approval after he had repaid the Purchased Amount in full.  When the Consumer complained, Yellowstone provided a partial refund of $2,900 and then stopped responding to him.

d.  A Utah Consumer complained that after making the required payments to Defendant Yellowstone under the Merchant Agreement, Yellowstone withdrew an additional $3,480, and the Consumer was subsequently unable to reach anyone from Yellowstone.

e.  A Florida Consumer had to pay her bank a stop payment fee to stop Defendant Yellowstone from continuing to withdraw purported Daily Payments from her account after she had already repaid the Purchased Amount in full.  At the time of the stop payment, Yellowstone had debited the Consumer's account for a total of $4,550, or $173 more than the $4,377 Purchased Amount the Consumer owed, but Yellowstone only provided the Consumer with a partial refund of $108.

129.   At various times, the Yellowstone MCA Defendants withdrew double the amount of the agreed-upon Daily Payment. For example:

a.  After a Colorado Consumer entered into a Merchant Agreement with Defendant Green Capital for a specified Daily Payment amount, Green Capital started debiting his account each day in an amount that was twice the agreed upon Daily Payment without the Consumer's knowledge or authorization.  When the Consumer brought this to the attention of Green Capital, it acted surprised and represented that it would not happen again, but then the double debits continued.  As a result of the unauthorized double debits, the Consumer's account had a negative balance, and other attempted payments bounced.

b.  Defendant Yellowstone's internal email correspondence reveals that Yellowstone repeatedly instructed that a Missouri Consumer's bank account be debited twice on the same day (e.g., "[d]ebit [] twice tomorrow . . . ."; and "[f]ire 2 more of these payments debits next Monday").

c.  On at least one occasion, after a Maryland Consumer put a hold on her account following Defendant High Speed's withdrawal of twice the Daily Payment amount for multiple days in a row, High Speed immediately filed a COJ against the Consumer allegedly based on her failure to maintain sufficient funds in her account.  High Speed made no effort to speak with the Consumer prior to filing the COJ. High Speed falsely asserted in the COJ filing that the Consumer had defaulted under the terms of the Merchant Agreement. Moreover, the Consumer emailed High Speed to explain that she had overpaid as a result of the duplicate withdrawals by High Speed, but High Speed refused to return the duplicate withdrawals to her account.

130.   On at least two occasions, Defendants Yellowstone and Green Capital debited Consumer accounts in excess of the agreed-upon amount specified in settlement agreements. For example:

    a.   Defendant Green Capital debited a Colorado Consumer's account for $966 more than the total amount authorized by the Consumer pursuant to a settlement agreement to resolve a COJ, thereby causing the Consumer to pay his bank a stop payment fee to prevent additional, unauthorized debits thereafter. Green Capital did not respond to the Consumer's repeated requests for a refund of the overpayment.

    b.   Defendant Yellowstone withdrew $6,152.39 from a Utah Consumer's account above the settlement amount authorized by the Consumer. When the Consumer brought this overpayment to Yellowstone's attention, she was "called stupid."

131.    In nearly all of these circumstances, when Consumers attempted to contact Defendants regarding the unauthorized withdrawals, they had difficulty receiving assistance.

132.    In the few instances where the Consumer was able to speak with a representative, Defendant Yellowstone typically failed to refund the unauthorized debits in part or in full. For example, when three Consumers from Nevada, Minnesota, and California contacted Yellowstone to complain that Yellowstone was continuing to debit their accounts after they had repaid the Purchased Amount in full, Yellowstone responded by: (1) refusing to return the excess payments to one Consumer; (2) advising another Consumer that its lending partners were refusing to return the excess funds; and (3) claiming to the third Consumer that its system did not reflect any amount owed to the Consumer.

    **3.**    **Defendants Unconscionably Used COJs and UCC-1 Financing Statements**

        **a.**  **Unconscionable Use of COJs**

133.    As noted, the Yellowstone MCA Defendants required Consumers to execute an Affidavit of COJ as part of the Merchant Agreement. By demanding that Consumers sign the Affidavit of COJ, the Yellowstone MCA Defendants compelled Consumers to waive their procedural rights and consent to the entry of judgment against them without notice or a hearing.

134.    Until recently, upon the occurrence of a Consumer's purported default, the MCA Collection Defendants would immediately file the COJ in New York (even against out-of-state

Consumers), obtain a judgment, and begin to enforce that judgment before the Consumers even learned of the judgment. With the judgment, the MCA Collection Defendants would freeze the Consumers' personal and business assets until the full, accelerated balance owed under the Merchant Agreements plus interest and fees was satisfied.

135.    At various times, Defendants filed COJs and obtained judgments against Consumers who did not default or otherwise breach the Merchant Agreements.  Defendants' enforcement of these improperly obtained judgments against these Consumers threatened the viability of their businesses.

136.    Examples of Defendants' fraudulent and unconscionable use of COJs include the following:

a.  Green Capital fraudulently filed a COJ and obtained a judgment against a Colorado Consumer that was not permitted by the terms of the Merchant Agreement. Green Capital falsely claimed in its Affidavit of Non-Payment filed in support of the COJ that the Consumer had ceased remitting payments and otherwise prevented Green Capital from debiting the Consumer's account. Contrary to Green Capital's claims, the Consumer was still making payments to Green Capital as of the date of the filing.  The Consumer did not receive any notice prior to entry of the fraudulent COJ and resulting judgment.  After obtaining the judgment in New York, Green Capital levied the Consumer's Colorado bank account, which had no New York branches, seized the Consumer's personal and business assets, and sent notifications to the Consumer's vendors.  The wrongfully-obtained judgment significantly harmed the Consumer's landscaping business during its peak season, interfered with the Consumer's ability to pay his employees and vendors, and resulted in a debt that had not gone into default appearing on the Consumer's credit report.  The Consumer also lost many of his long-term clients, and vendors, whom he had worked with for 20 to 25 years.

b.  High Speed improperly filed a COJ and obtained a judgment against a Maryland Consumer.  The Consumer was forced to put a hold on her account because High Speed continued debiting twice the amount of the Daily Payment provided in the Merchant Agreement after the Consumer contacted High Speed to explain that she had overpaid as a result of the unauthorized withdrawals and to request a refund.  High Speed refused to provide a refund.  Instead, High Speed filed a COJ without informing the Consumer, falsely claiming that the Consumer had defaulted under the Merchant Agreement and obtained a judgment against the Consumer.  Following the fraudulent COJ filing and resulting judgment, High

Speed levied the Consumer's business and personal bank accounts and unlawfully obtained thousands of dollars. High Speed later falsely claimed it was unaware of the levies and promised to return the funds and lift the levies. High Speed delayed for approximately six weeks before removing the levy on the Consumer's personal account, which caused her to incur thousands of dollars in overdraft fees, returned payment fees, and other significant damages. High Speed's wrongfully obtained judgment and levy hindered the Consumer's ability to access her own funds, to obtain legitimate financing, and effectively to continue operating until High Speed removed the fraudulent judgment and levy.

137.   At various times, Defendants Yellowstone and MCA Recovery agreed to revise repayment terms or provided the required "prior written consent" for a bank change, but when the Consumers acted on that agreement or authorization, Yellowstone and MCA Recovery immediately filed COJs and obtained judgments against them.   For example:

a.   Yellowstone and MCA Recovery filed a COJ and obtained a judgment against a Michigan Consumer who had changed banks based on a purported "default" caused when the Consumer switched banks. No actual "default" occurred under the terms of the Merchant Agreement because the Consumer had obtained the required "prior written consent" from Yellowstone before timely continuing to make payments from a new bank account. The Consumer contacted Yellowstone and requested a new ACH Authorization Form so he could designate a new bank and continue making timely payments. Yellowstone agreed and provided the Consumer with the new ACH Authorization Form, which he timely completed and returned to Yellowstone. Yet, Yellowstone and MCA Recovery still filed the COJ and obtained a judgment against the Consumer, despite providing the "prior written consent." After obtaining the judgment, Yellowstone and MCA Recovery immediately sent credit card processing freezes to the Consumer's bank and unlawfully attempted to enforce the judgment in Michigan, a state where Yellowstone and MCA Recovery were not licensed. Yellowstone and MCA Recovery also froze the monies owed to the Consumer from his financing company, thereby causing: vehicles not to be paid for; titles, registrations, and license plates not to be issued; vehicles to be impounded; and the Consumer to vacate his business premises because he could not make payments to the land contract vendor.

b.   After agreeing to revised repayment terms, Yellowstone filed a COJ and obtained a judgment against a North Carolina Consumer even though it was debiting the Consumer's account for the revised Daily Payment. After obtaining a judgment against the Consumer, Yellowstone garnished the wages of the Consumer's employees and seized both the merchant's business assets and the personal assets of the guarantor – the small business owner. The Consumer's business suffered greatly and several of his employees lost their

jobs even though the Consumer was making his Daily Payments on time.  In addition, a debt that was never in default now appears on the Consumer's credit report.

138.    At various times, Defendants Green Capital, High Speed, Yellowstone, and MCA Recovery filed false Affidavits of Non-Payment in support of COJs that misrepresented to the court the facts of alleged defaults.  For example:

    a.  Green Capital filed an Affidavit of Non-Payment in court on June 24, 2019 claiming that the Colorado Consumer had ceased making payments on June 18, 2019, when the Consumer had continued making Daily Payments.  In fact, the Consumer made Daily Payments on June 21 (Friday), June 24 (Monday), and June 25 (Tuesday) and only stopped making payments after learning that Green Capital had wrongfully filed the COJ seeking a judgment in breach of the Merchant Agreement.  Green Capital's sworn Affidavit also misrepresented that the Consumer had obstructed Green Capital's access to the designated bank account.

    b.  High Speed filed a sworn Affidavit of Non-Payment on August 7, 2018, falsely claiming that a Maryland Consumer was in default when the Consumer had complied with all of her obligations under multiple Merchant Agreements.  The Consumer stopped payment as a result of High Speed's continued duplicate withdrawals and refusal to refund the excess amounts.  At that time the Consumer had actually paid more to High Speed than what was due under the Merchant Agreements at the time the Affidavit was filed.

    c.  Yellowstone and MCA Recovery filed a sworn Affidavit of Non-Payment claiming a Michigan Consumer was in default under the Merchant Agreement. In fact, the Consumer had simply changed banks with Yellowstone's "prior written consent" and timely submitted a revised ACH Authorization Form to Yellowstone.

139.    Defendants' fraudulent and unconscionable practices in connection with the filing of COJs have caused substantial harm to small businesses and their owners.

**b.  Unconscionable Use of Security Agreements and UCC Filings**

140.    As noted above, the Yellowstone MCA Defendants also required Consumers to execute Security Agreements before they would advance any funds, which enable Defendants to file UCC-1 financing statements in the event of an alleged default.

141.    Defendant Yellowstone and the MCA Collection Defendants have also filed

fraudulent and wrongful UCC-1 financing statements to the financial detriment of Consumers. For example:

     a. Yellowstone and Max Recovery filed a UCC-1 financing statement against a Missouri Consumer claiming she had an outstanding balance when the Consumer had already fulfilled all of her obligations under the Merchant Agreement.  As a result, the Consumer needed to file an application with the Missouri Secretary of State to have the UCC-1 filing removed.  Relying on the wrongfully obtained UCC-lien, Yellowstone and Max Recovery contacted and directed at least one of the Consumer's customers to pay Yellowstone and Max Recovery instead of the Consumer, thereby threatening the Consumer's relationship with the customer.

     b. Yellowstone and MCA Recovery wrongfully filed a UCC-1 financing statement against a Michigan Consumer who was not in default under the terms of the Merchant Agreement.  As a result, the Consumer was compelled to file an application with the Michigan Department of State to terminate the UCC filing.  Based on the information provided by the Consumer, the UCC Filing Office terminated the financing statement after finding that it was "fraudulent or wrongfully filed."  However, Yellowstone's and MCA Recovery's fraudulent UCC filing had already caused substantial damage to the Consumer's business because they had already sent UCC lien notices to third parties based on the false default, fraudulently seized the Consumer's assets with the financing company for the Consumer's business, and even failed to release the Consumer's assets after the UCC termination.

142.    Defendants' fraudulent and unconscionable practices in connection with the filing of UCC-1 financing statements have caused substantial harm to small businesses and their owners.

**c. Unconscionable Use of Improperly Obtained Judgments and UCC Filings to Extract Inequitable Settlements**

143.    At various times, Defendants have abused the immense leverage they gained over financially distraught Consumers as a result of wrongfully obtained judgments and UCC liens to extract unfair settlement agreements from Consumers. For example:

     a. High Speed induced the Maryland Consumer referenced in paragraph 136, acting without counsel, to enter into two settlement agreements by representing to the Consumer that executing the settlement agreements was the only way for the Consumer to regain access to her bank accounts and avoid going out of business.  After doing so, High Speed then failed to honor its obligation under those settlement agreements to remove the improperly obtained judgment and lien, which prevented the Consumer from finalizing a lending agreement with

the Small Business Administration.  High Speed further violated the agreement terms by illegally withdrawing several thousand dollars from the Consumer's personal account, resulting in significant damages in excess of the amounts unlawfully converted.

b.  Yellowstone and MCA Recovery attempted to obtain a substantial settlement from the Michigan Consumer referenced in paragraph 141, representing that a settlement was a prerequisite to Yellowstone and MCA Recovery terminating the UCC filing, releasing any held accounts, and filing a satisfaction of judgment for the Consumer.  Yellowstone and MCA Recovery made this representation on July 21, 2016, when the Michigan Department of State had already terminated the UCC filing on July 13, 2016 after finding that it was "fraudulent or wrongfully filed."  Nonetheless, Yellowstone and MCA Recovery refused to release the Consumer's assets seized pursuant to the fraudulent UCC filing in the hopes of extorting a settlement from the Consumer (e.g., emailing the Consumer "[m]ake me an offer to settle this and everything will be released," even as the Consumer protested that Yellowstone and MCA Recovery had "locked up everything where there is no money whatsoever and customers that purchased vehicles can[']t get titles or plates for [their] vehicles" and that "the credit card processors are eating up the money that is sitting in [their] account [and] trying to debit my account for service charges").

### 4.  The Yellowstone MCA Defendants Fraudulently Induced Consumers to "Refinance" Their MCAs Rather than Engage in Reconciliation

144.  On at least one occasion, Defendants High Speed, HFH, and World Global, together with Third Parties acting on their behalf, induced a Maryland Consumer seeking to lower her payment to "refinance" the outstanding balance of an existing MCA into a second MCA despite the fact that reconciliation was an option.

145.  Defendants High Speed, HFH, and World Global failed to disclose that this strategy would result in double the interest on the same principal amount, and thus an outstanding balance that is significantly greater than the balance the Consumer would have owed had it simply paid off the first MCA without "refinancing."

146.  Defendants High Speed, HFH, and World Global misrepresented that refinancing her Merchant Agreements would enable her to keep up with Daily Payments under the prior agreements and to maintain sufficient cash flow to operate her business, rather than advising the

Consumer of her ability to reconcile the current Daily Payment amounts with her company's actual receivables under her existing Merchant Agreements.

147.    The "refinancing" resulted in a substantially higher total repayment amount for the Consumer, as High Speed, HFH, and World Global inflated her carryover balances from prior agreements and charged her double the interest on the same outstanding debt in each new agreement.

### 5. Defendants Engaged in Threatening and Harassing Collection Efforts

148.    Defendants Yellowstone, MCA Recovery, Green Capital, and High Speed have engaged in harassing and threatening collection calls to Consumers to induce them to continue making their Daily Payments. For example:

   a. A Tennessee Consumer explained that when the small business "ran into hard times," Yellowstone "[did]n't listen and ke[pt] pushing for more and more money." Instead of pursuing reconciliation with the Consumer due to the business's hard times, Yellowstone continued its near-constant calls and harassment. The Consumer reported that the Yellowstone representative would get angry, yell, threaten to shut down the business, and hang up.

   b. A New Jersey Consumer reported: "[w]e are in the construction business and have experienced a lull this winter. We missed 1 payment and in just a very short time have been harassed and threatened by [Defendant Green Capital] that they're coming after our assets, our family, freezing our bank account, threatened bodily harm, etc. [Defendant Green Capital] ha[s] conducted multiple federal offenses including running our credit without our consent [and] spoofing our phones[.]"

   c. High Speed bullied a Maryland Consumer by not letting her speak when she attempted to ask for reconciliation, as well as for an explanation of the inflated carryover balances and resulting usurious interest. The Consumer described a collection call she received from High Speed as follows:

      High Speed said, "You know you have a balance right?" – I started by saying, "I don't know" - and was abruptly cut off by High Speed who was telling me my head was up my ass and whatever else. If he had let me finish my sentence, it would have sounded like this, "I don't know what the balance should be because I noticed that the carry over balances were getting interest added each time which calculated to 132% interest. Could

39

you take a look at my info and please adjust in the event I am missing something?"

d.   After Yellowstone and MCA Recovery learned that a Michigan Consumer had contacted the State of Michigan's Secretary of State in an effort to terminate Yellowstone's fraudulent UCC filing, Yellowstone's and MCA Recovery's representatives called the Consumer and threatened him: "[They were] really mad and threatened me that I will get 5 years in prison for terminating the UCC filing."

e.   A Colorado Consumer was "constantly threatened [by Defendant Green Capital] that the COJ would be filed if [he] missed a payment."

f.   The same day Yellowstone and MCA Recovery filed a COJ against a North Carolina Consumer, their attorney started calling to threaten the Consumer and his employees.  Prior to the COJ filing, the Consumer had reached out to Yellowstone repeatedly to advise that no money was coming in, but Yellowstone kept demanding the same Daily Payment and never mentioned reconciliation.  On the day of the COJ filing, Yellowstone and/or MCA Recovery started to make threatening calls to the Consumer 40 to 50 times a day.  During collection calls, Defendant Yellowstone "threatened to have [the Consumer] arrested, threatened to have all accounts seized which they did, [and] threatened to come . . . take care of things."  Yellowstone called "every day saying no payment or not enough" and threatened "legal action[,] . . . jail, property seized, and assets taken."  At one point, the threats escalated to a point where the attorney for Yellowstone and MCA Recovery claimed he was in front of the Consumer's store (in North Carolina) and was coming in.  After the COJ was filed, Yellowstone and MCA Recovery obtained a judgment and froze all of the Consumer's assets and shut the Consumer's business down.  The Consumer lost all his bank accounts, lost his point-of-sale system, and ultimately lost his business.  Despite losing everything, the Consumer continued to be harassed and threatened through multiple daily calls, including calls made by Defendant Yellowstone from spoofed phone numbers.

**6.    Defendants Conducted Unauthorized and Excessive Credit Checks**

149.   At various times, Defendants Yellowstone and MCA Recovery have conducted unauthorized and/or excessive credit checks.

150.   For example, a Michigan Consumer discovered that Yellowstone and MCA Recovery had provided Arch Capital Funding LLC ("Arch Capital") with permission to do an unauthorized hard inquiry into his credit without first obtaining the Consumer's prior authorization, and that they had then used that credit check from Arch Capital also without the

Consumer's prior authorization. Defendant Yellowstone released the Consumer's personal information to Defendant MCA Recovery, who forwarded the personal information to Arch Capital, an entity formerly affiliated with Yellowstone, who then conducted the hard credit inquiry.

151. On another occasion, Yellowstone harmed a Consumer's credit score and subsequent loan terms by conducting excessive credit checks in connection with the Consumer's MCA applications. Specifically, in connection with two MCA applications a Mississippi Consumer submitted to Yellowstone for a business loan, Yellowstone conducted eight hard inquiries on the Consumer's credit. Yellowstone never provided a loan or any funding to the Consumer, but Yellowstone's eight credit checks caused the Consumer's credit score to decline by 36 points.

152. Likewise, in connection with a Maryland Consumer's application for an MCA, Defendant Yellowstone conducted an unauthorized hard credit inquiry negatively impacting the Consumer's credit, despite the Consumer's express authorization of a soft inquiry only.

### 7. Defendant Yellowstone Is Responsible for and Conducted Little to No Oversight of Third Parties' Underwriting, Servicing, and Collections In Its Name

153. At various times, Defendant Yellowstone employed, contracted with, and/or acted through and in concert with a web of Third Parties, including entities and/or individuals described by Yellowstone as Independent Funding Organizations ("Funders"), Independent Sales Organizations ("ISOs"), and Sales Representatives, in its MCA transactions with Consumers.

154. Yellowstone claims these Third Parties have assumed a number of functions, including acting as a broker, underwriting, evaluating, and negotiating potential Merchant Agreements, and servicing and collecting amounts owed on Merchant Agreements in the event of default.

155. Between at least July 2015 and July 2019, Defendant Yellowstone held out Third

Parties to Consumers as indistinguishable from Yellowstone itself.   During this period, Yellowstone did not disclose to Consumers the Third Parties' functions and/or involvement with the performance of the Merchant Agreement.  Meanwhile, Yellowstone permitted Third Parties to use Yellowstone email addresses in correspondence with Consumers.

156.    At various times, Third Parties operated out of Yellowstone's Jersey City, New Jersey office.

157.    At various times, Third Parties and/or their employees were either former employees or management of Yellowstone and/or current employees or management of Yellowstone.

158.    At various times, Yellowstone allowed Third Parties to use the Yellowstone platform to perform Consumer credit checks without notice to or the consent of Consumers.

159.    At all relevant times, the Consumers transacting with Yellowstone believed that they negotiated their Merchant Agreements with Yellowstone, and that Yellowstone remained their point of contact for subsequent correspondence relating to their Merchant Agreements.

160.    At various times, Yellowstone shared the Consumer's Merchant Agreement, including the Consumer's sensitive banking information, with Third Parties, without first obtaining the Consumer's express informed consent.

161.    To the extent Defendant Yellowstone and/or any of the other Yellowstone MCA Defendants acting in concert with Yellowstone seek to disclaim liability for any of the acts and/or conduct alleged herein on the grounds that the Third Parties purportedly engaged in the underlying misconduct, Yellowstone and/or the other Yellowstone MCA Defendants are responsible for the Third Parties' performance of their roles and responsibilities relating to the Merchant Agreements.

162.    Not only has Defendant Yellowstone failed to disclose and held the Third Parties

out to Consumers as Yellowstone's employees, representatives, and/or agents, but it has also failed to conduct any meaningful supervision of the Third Parties' brokering, underwriting, negotiating, servicing, and collection activities relating to Yellowstone's Merchant Agreements with Consumers.

## COUNT I

### VIOLATION OF THE CFA BY DEFENDANTS
### (UNCONSCIONABLE COMMERCIAL PRACTICES)

163.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 162 above as if more fully set forth herein.

164.    The CFA, N.J.S.A. 56:8-2, prohibits:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

165.    The CFA defines "merchandise" as including "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c).

166.    At all relevant times, the Yellowstone MCA Defendants have engaged in the advertisement and sale of merchandise within the meaning of N.J.S.A. 56:8-1(c), including MCAs, and the MCA Collection Defendants have engaged in the advertisement and sale of merchandise within the meaning of N.J.S.A. 56:8-1(c), including debt collection services.

167.    In the operation of their business, Defendants have engaged in the use of unconscionable commercial practices, false promises, misrepresentations and/or the knowing

concealment, suppression or omission of material facts.

168.    At various times, Defendants have engaged in unconscionable commercial practices including, but not limited to, the following:

a.   Charging unlawful interest rates on small business loans disguised as purchases of receivables, in excess of the maximum rates permitted by New Jersey usury laws;

b.   Refusing Consumers' requests for reconciliation and directing that the advance be paid back within a specified time period even where the Consumers' businesses have no incoming receivables, or simply failing to respond to Consumers' inquiries regarding reconciliation;

c.   Making unauthorized withdrawals from Consumers' accounts, including by withdrawing double the amount of the agreed-upon Daily Payment, often causing additional financial harm to Consumers such as overdraft fees and lost operating capital;

d.   Continuing to withdraw purported Daily Payments from Consumer bank accounts after the Consumers had fully repaid the "Purchased Amount," and then failing to timely refund the Consumers either in whole or in part and/or to respond at all to Consumer inquiries regarding the unauthorized withdrawals;

e.   Debiting Consumer accounts in excess of the agreed-upon amount specified in settlement agreements;

f.   Failing to respond to Consumer complaints, inquiries, and/or refund requests in a timely manner or at all;

g.   Compelling Consumers to execute an Affidavit of COJ as part of the Merchant Agreement, thereby waiving their procedural rights and consenting to the entry of judgment against them without notice or a hearing;

h.   Filing COJs and obtaining judgments against Consumers who did not default or otherwise breach the Merchant Agreements;

i.   Enforcing improperly obtained judgments against Consumers, thereby threatening the viability of their businesses;

j.   Filing false Affidavits of Non-Payment in support of COJs that misrepresented to the court the facts of alleged defaults;

k.   Filing fraudulent and wrongful UCC-1 financing statements to the financial detriment of Consumers;

l.   Abusing the immense leverage Defendants gained over financially distraught Consumers as a result of wrongfully obtained judgments and UCC liens to extract unfair settlement agreements from Consumers;

m.   On at least one occasion, levying an out-of-state bank account in Colorado with no New York branches, thereby resulting in the Consumer's loss of long-term clients;

n.   On at least one occasion, knowingly preventing a Consumer's business from finalizing its lending agreement with the Small Business Administration by failing to timely honor the provision in the settlement agreement requiring withdrawal of the COJ and removal of the lien on the Consumer's bank accounts;

o.   On at least one occasion, illegally withdrawing several thousand dollars from a Consumer's personal account, thereby causing significant damages in excess of the amounts unlawfully converted;

p.   Falsely inflating carryover balances to be "refinanced" in each successive deal and charging the Consumer double the interest on the same outstanding debt from prior agreements in each new agreement;

q.   Engaging in harassing and threatening collection calls to Consumers to induce them to continue making their Daily Payments;

r.   Fixing attorneys' fees in the Merchant Agreement at an arbitrary percentage (25%) of the accelerated balance that is grossly disproportionate to the fees actually incurred in filing COJs and related documents;

s.   Including substantively unconscionable contract provisions in the Merchant Agreements  (e.g., clauses requiring Consumers to execute a COJ, thereby forcing Consumers to waive their rights to notice and a hearing; clauses providing that Consumers "consent[] to the waiver of notice" prior to the Yellowstone MCA Defendants exercising any rights under the Merchant Agreements; "No Liability" clauses requiring Consumers to waive any claims against the Yellowstone MCA Defendants "under any legal theory"; power of attorney clauses requiring the merchant to "irrevocably appoint[] [the Yellowstone MCA Defendants] as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations" due to the Yellowstone MCA Defendants from Consumers upon the occurrence of an Event of Default under the Merchant Agreement, including to collect monies that have become due with respect to any of the collateral, to endorse checks related to that collection, to sign the Consumer's name on any invoice directing the Consumer's customers to make their payments directly to the

45

Yellowstone MCA Defendants, and "to enforce its rights with respect to payment of the Purchased Amount"; and clauses providing for both jury trial waivers and class action waivers);

t.  Conducting unauthorized and/or excessive credit checks;

u.  Allowing Third Parties to use the Yellowstone platform to perform Consumer credit checks without notice to or the consent of Consumers;

v.  Sharing the Consumer's Merchant Agreement, including the Consumer's sensitive banking information, with Third Parties, without first obtaining the Consumer's express informed consent;

w.  Failing to conduct any meaningful supervision of the Third Parties' brokering, underwriting, negotiating, servicing, and collection activities relating to Defendant Yellowstone's Merchant Agreements with Consumers;

x.  Filing Affidavits of COJ designating 10 counties for filing, in violation of the requirement in N.Y. C.P.L.R. § 3218 that the Affidavit designate only one county where the Affidavit may be filed;

y.  Failing to advise Consumers that the following documents are all part of their contract with the Yellowstone MCA Defendants and/or explain the impact of these documents on the contract: the Addendum converting the Specified Percentage of receivables to a fixed Daily Payment, the Security Agreement requiring Consumers to provide the Yellowstone MCA Defendants with a security interest in all of their assets, the Guaranty requiring the individual owner to personally guarantee the performance of the small business, and the Affidavit of COJ allowing Defendants to immediately obtain a judgment in the event of an alleged default without notice or a hearing;

z.  Burying the Consumer's right to request a reconciliation in small print in the Addendum to the Merchant Agreement;

aa. Failing to specify in the "Events of Default" section of the Merchant Agreement that in some instances, just two or four missed payments constitutes a default, thereby triggering the enforcement mechanisms available to Defendants through the Security Agreement, the Guaranty, and the COJ, and instead burying this event of default under "NSF Fee" in Appendix A to the Merchant Agreement that provides a list of fees;

bb. Providing the Merchant Agreements in small, illegible type, with material provisions in some instances appearing in 5.5-point to 6-point font size; and

cc. Providing in the Merchant Agreements and Security Agreements that

46

the Yellowstone MCA Defendants may use another legal name and/or doing business as name when filing UCC-1 financing statements and other notices or filings, without identifying other legal names or doing business as names that the Yellowstone MCA Defendants might use.

169.    Each unconscionable commercial practice by Defendants constitutes a separate violation under the CFA, specifically N.J.S.A. 56:8-2.

## COUNT II

### VIOLATION OF THE CFA BY DEFENDANTS
### (FALSE PROMISES, MISREPRESENTATIONS, DECEPTION
### AND KNOWING OMISSIONS OF MATERIAL FACT)

170.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 169 above as if more fully set forth herein.

171.    Defendants' conduct in violation of the CFA includes, but is not limited to, the following acts of false promises, misrepresentations and/or deception:

   a.   Misrepresenting or concealing from Consumers the true nature of the MCA transactions as usurious loans;

   b.   Misrepresenting to Consumers the amount of the Purchase Price they would receive, the amount of fees the Yellowstone MCA Defendants would debit from their bank accounts, and the upfront fees they charged;

   c.   Failing to conspicuously disclose that various fees buried towards the end of the Merchant Agreements are withdrawn upfront from the promised Purchase Price;

   d.   Providing that several of the fees would be either a defined amount or a percentage of the funded amount (e.g., ACH Program Fee of "$395.00 or up to 10% of the funded amount," Bank Fee of "$195.00 or up to 10% of the funded amount"), but then failing to notify Consumers what the specific amount of each of those fees would be and whether those amounts would be withheld from the Purchase Price;

   e.   Withholding amounts greater than the specified fee amount from the Purchase Price or failing to disclose additional withheld fee(s);

   f.   Fraudulently inducing Consumers to "Refinance" their MCAs rather than engage in reconciliation;

   g.   Concealing from a Consumer the compounded interest charges for

47

"refinancing" previous balances under prior Merchant Agreements;

h.  Representing on the Yellowstone Website that "we say yes to more small businesses, regardless of collateral or credit," but then requiring Consumers to execute Security Agreements providing collateral to Defendants in the event of a default and repeatedly conducting excessive and/or unauthorized credit checks in considering Consumer applications for MCAs;

i.  Representing in advertising that Yellowstone's business loans are "unsecured," but then specifically labeling the Merchant Agreements as "secured" and requiring Consumers to provide various forms of security to Yellowstone as a prerequisite to receiving MCAs;

j.  Representing in advertising that Yellowstone offers flexible repayment terms (e.g., "if sales are up[,] you'll pay a larger repayment, but if sales are down, you'll pay less"), but then ignoring or refusing Consumer requests to pay less when their sales were down;

k.  Representing in advertising that "We Provide Capital With No Personal Guarantee," but then requiring Consumers to execute a Guaranty and Affidavit of COJ as part of the Merchant Agreements that require the Consumer to personally guarantee the MCA in the event of a default;

l.  Representing to Consumers that Defendants Yellowstone and MCA Recovery maintained an office in New York, when at least two Consumers flew from different states to Defendants' office in New York only to find that there was no office at the location provided by Defendants;

m.  Holding individuals or entities out as employees to Consumers by permitting those individuals or entities to work out of desktops on Yellowstone premises, or to send emails to Consumers from Yellowstone email addresses, but then later claiming those individuals or entities were "Third Parties" for which Defendant Yellowstone was not responsible;

n.  Prior to July 2019, failing to disclose to Consumers the Third Parties' functions and/or involvement with the performance of the Merchant Agreements at the time of funding, despite permitting Third Parties to use Yellowstone email addresses in correspondence with Consumers;

o.  Requiring Consumers to execute Affidavits of COJ as part of the Merchant Agreements without providing any explanation of what the COJ was or its impact on the Consumers (e.g., sending the COJ with the Merchant Agreement as an attachment to an email and directing the Consumer to return same within a short period of time);

p.   Agreeing to revise repayment terms or providing the required "prior written consent" for a bank change, but then, when the Consumers acted on that agreement or authorization, immediately filing COJs and obtaining judgments against them;

q.   Misrepresenting the availability of reconciliation, but then refusing Consumers' requests for reconciliation and directing that the advance be paid back within a specified time period, or simply failing to respond to Consumers' inquiries regarding reconciliation;

r.   Prior to November 2018, failing to adequately inform Consumers of their right to request reconciliation (under the Merchant Agreements) at the time of funding; and

s.   Entering settlement agreements with Consumers, but then failing to abide by the terms of those agreements, thereby causing additional financial harm to Consumers.

172.   Each false promise, misrepresentation, deception, and/or knowing omission of material fact by Defendants constitutes a separate violation under the CFA, specifically N.J.S.A. 56:8-2.

## COUNT III

### VIOLATION OF THE CFA BY YELLOWSTONE MCA DEFENDANTS (USE OF UNREGISTERED, ASSUMED OR FICTITIOUS NAMES)

173.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 172 above as if set forth more fully herein.

174.   N.J.S.A. 56:1-2, which prohibits a person from conducting business under an assumed name that is not registered, provides in pertinent part:

> No person shall conduct or transact business under any assumed name, or under any designation, name or style, corporate or otherwise, other than the real name or names of the individual or individuals conducting or transacting such business, unless such person shall file a certificate in the office of the clerk of the county or counties in which such person conducts or transacts, or intends to conduct or transact, such business, together with a duplicate thereof

for filing in the office of the Secretary of State, as provided in section 56:1-3 of this Title.

[N.J.S.A. 56:1-2.]

175.    Pursuant to N.J.S.A. 56:1-5, corporations are exempted from the requirements of N.J.S.A. 56:1-2; however, individuals and limited liability companies must register their assumed names.

176.    At all relevant times, the Yellowstone MCA Defendants were limited liability companies required to register their assumed names.

177.    At all relevant times, the Yellowstone MCA Defendants included a provision in the Merchant Agreements and Security Agreements purporting to permit them to conduct business under unregistered assumed names.

178.    The Yellowstone MCA Defendants have engaged in conduct in violation of N.J.S.A. 56:1-2 by providing in the Merchant Agreements and Security Agreements that the Yellowstone MCA Defendants may use another legal name and/or doing business as name when filing UCC-1 financing statements and other notices or filings, without identifying other legal names or doing business as names that the Yellowstone MCA Defendants might use.

179.    The Yellowstone MCA Defendants' conduct constitutes an unconscionable commercial practice in violation of the CFA, specifically N.J.S.A. 56:8-2.

## COUNT IV

### VIOLATION OF THE ADVERTISING
### REGULATIONS BY DEFENDANT YELLOWSTONE

180.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 179 above as if more fully set forth herein.

181.    The Advertising Regulations, N.J.A.C. 13:45A-9.1 to -9.8, address, among other

issues, general advertising practices.

182.   Specifically, the Advertising Regulations governing general advertising practices

provide, in relevant part:

(a)   Without limiting the application of N.J.S.A. 56:8-1 [to -226], the following
      practices shall be unlawful with respect to all advertisements:

      . . . .

      9.   The making of false or misleading representations of facts
           concerning the reasons for, existence or amounts of price reductions,
           the nature of an offering or the quantity of advertised merchandise
           available for sale.

      [N.J.A.C. 13:45A-9.2(a)(9).]

183.   Defendant Yellowstone violated the Advertising Regulations by engaging in

certain conduct including, but not limited to:

a.   Representing on the Yellowstone Website that "we say yes to more
     small businesses, regardless of collateral or credit," but then requiring
     Consumers to execute Security Agreements providing collateral to
     Yellowstone in the event of a default and repeatedly conducting
     excessive and/or unauthorized credit checks in considering Consumer
     applications for MCAs;

b.   Representing in advertising that Yellowstone's business loans are
     "unsecured," but then specifically labeling the Merchant Agreements as
     "secured" and requiring Consumers to provide various forms of security
     to Yellowstone as a prerequisite to receiving MCAs;

c.   Representing in advertising that Yellowstone offers flexible repayment
     terms (e.g., "if sales are up[,] you'll pay a larger repayment, but if sales
     are down, you'll pay less"), but then ignoring or refusing Consumer
     requests to pay less when their sales were down; and

d.   Representing in advertising that "We Provide Capital With No Personal
     Guarantee," but then requiring Consumers to execute a Guaranty and
     Affidavit of COJ as part of the Merchant Agreements that require the
     Consumer to personally guarantee the MCA in the event of a default.

184.   Defendant Yellowstone's conduct constitutes multiple violations of the Advertising

Regulations, specifically N.J.A.C. 13:45A-9.2(a)(9), each of which constitutes a per se violation

of the CFA, specifically N.J.S.A. 56:8-2.

## **PRAYER FOR RELIEF**

WHEREFORE, based upon the foregoing allegations, Plaintiffs respectfully request that

the Court enter judgment against Defendants:

(a)     Finding that the acts and practices of Defendants constitute multiple instances of unlawful practices in violation of the CFA, N.J.S.A. 56:8-1 to -226 and that the acts and practices of Defendant Yellowstone constitute multiple instances of unlawful practices in violation of the Advertising Regulations, N.J.A.C. 13:45A-9.1 to -9.8;

(b)     Permanently enjoining Defendants and their owners, officers, directors, shareholders, founders, managers, members, agents, servants, employees, representatives, independent contractors and all other persons or entities under their control, from engaging in, continuing to engage in or doing any acts or practices in violation of the CFA, N.J.S.A. 56:8-1 to -226, and the Advertising Regulations, N.J.A.C. 13:45A-9.1 to -9.8, including, but not limited to, the acts and practices alleged in this Complaint, as authorized by the CFA, specifically N.J.S.A. 56:8-8;

(c)     Directing Defendants, jointly and severally, to restore to any affected person, whether or not named in this Complaint, any money or real or personal property acquired by means of any practice alleged herein to be unlawful and found to be unlawful, as authorized by N.J.S.A. 56:8-8;

(d)     Directing Defendants, jointly and severally, to pay the maximum statutory civil penalties for each and every violation of the CFA, in accordance with N.J.S.A. 56:8-13;

(e)     Directing Defendants, jointly and severally, to pay costs and fees, including attorneys' fees, for the use of the State of New Jersey, as authorized by N.J.S.A. 56:8-11 and N.J.S.A. 56:8-19;

(f)     Directing Defendants, jointly and severally, to disgorge all profits unlawfully acquired or retained, as authorized by N.J.S.A. 56:8-8;

(g)     Ordering the rescission of each ongoing agreement entered into between the Yellowstone MCA Defendants and any Consumer in connection with an MCA, including each Merchant Agreement; Addendum to Secured Merchant Agreement; Appendix A – Fee Structure; ACH Authorization Form; a Security Agreement and Guaranty; and/or an Affidavit of COJ;

(h)    Ordering Defendants to apply to vacate all unlawfully obtained judgments issued in their favor against Consumers by all courts that have issued such judgments, in papers acceptable to the Plaintiffs;

(i)    Ordering Defendants to file papers sufficient to terminate all unlawfully obtained liens or security interests related to their MCAs;

(j)    Ordering Defendants to file papers or take other actions sufficient to stay the execution of or collection of unlawfully obtained judgments;

(k)    Ordering Defendants to provide an accounting to Plaintiffs of the names and addresses of each Consumer from whom Defendants collected or received monies since July 16, 2015, in connection with MCAs and a complete history, by dates, amounts, and sources, of all monies collected or received by Defendants from all such Consumers (whether through daily payments, execution of judgments, or any other avenue), and all moneys provided by Defendants to such Consumers; and

(l)    Granting such other relief as the interests of justice may require.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _____

Chanel Van Dyke
Deputy Attorney General
Consumer Fraud Prosecution Section

Dated: December 8, 2020
       Newark, New Jersey

## RULE 4:5-1 CERTIFICATION

I certify, to the best of my information and belief, that the matter in this action involving the aforementioned violations of the CFA, N.J.S.A. 56:8-1 to -226, and the Advertising Regulations, N.J.A.C. 13:45A-9.1 to -9.8, is not the subject of any other action pending in any other court of this State.  I further certify, to the best of my information and belief, that the matter in controversy in this action is not the subject of a pending arbitration proceeding in this State, nor is any other action or arbitration proceeding contemplated.  I certify that there is no other party who should be joined in this action at this time.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs


By: _____
       Chanel Van Dyke
       Deputy Attorney General
       Consumer Fraud Prosecution Section

Dated: December 8, 2020
        Newark, New Jersey

## RULE 1:38-7(c) CERTIFICATION OF COMPLIANCE

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _Chanel Van Dyke_____
      Chanel Van Dyke
      Deputy Attorney General
      Consumer Fraud Prosecution Section

Dated:  December 8, 2020
       Newark, New Jersey

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Deputy Attorney General Chanel Van Dyke is hereby designated as trial counsel for the Plaintiffs in this action.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _Chanel Van Dyke_____
      Chanel Van Dyke
      Deputy Attorney General
      Consumer Fraud Prosecution Section

Dated:  December 8, 2020
       Newark, New Jersey